# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### PEORIA, ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA,    )  | |
| )  | |
| Plaintiff,    )  | |
| )  | |
| v.    )  | Case No. 25 – CR – 10030 |
| )  | |
| DEREK LOPEZ,    )  | |
| )  | |
| Defendant.    )  | |

## MOTION TO REVOKE DETENTION ORDER

Defendant Derek Lopez, by and through his attorney Jessica Douglas of the Federal Public Defender's Office for the Central District of Illinois, respectfully moves this Court to revoke the detention order in this case (R. 9), pursuant to 18 U.S.C. § 3145(b) and Fed. R. Crim. P. 59. Mr. Lopez requests that this Court release him on bond with conditions, pending the resolution of his case. In support thereof, Mr. Lopez states as follows:

### I.    Introduction

Mr. Lopez respectfully proposes that the Magistrate Judge committed reversible legal error when denying Mr. Lopez's release on bond pursuant to Fed. R. Crim. P. 32.1(a)(6) and 18 U.S.C. § 3143(a)(1). The Court found the Defendant has not established by clear and convincing evidence that there are conditions or a combination of conditions that will reasonably assure the Defendant's appearance in court for the reasons stated on the record. The Defendant established by clear and convincing evidence that there are conditions or a combination of conditions that will reasonably assure the safety of the

community or any other person for the reasons stated on the record.

Ultimately, the Court misapplied the Bail Reform Act (BRA) when erring in favor of detention, rather than release. Mr. Lopez presented clear and convincing evidence, including testimony, that he was not a flight risk and that the alleged conduct presenting a danger to the community could be reasonably mitigated with a third party custodian, electronic monitoring, and home detention. Mr. Lopez respectfully incorporates the testimony, proffers, and oral arguments made during the November 3, 2025, detention hearing. Audio Recording of Detention Hearing 11.03.2025.

**Factual Background**

The Government proffered the Criminal Complaint filed on October 28, 2025. R. 1. Additionally, the Government proffered the Pretrial Services Report completed by Probation in anticipation of the detention hearing. R. 7. The Government continued by proffering that Agent Stodolkiewicz spoke with the Defendant's mother by phone and she advised that in February or March her son had started making political posts and those posts continued in recent months. Audio Det. Hrg. 1:00:13 – 01:27:21. Mr. Lopez's mother also told the Agent that the are a close family but his relationship with his brothers has been strained by his political views. Audio Det. Hrg. 1:27:23 – 1:53:21. The Government continued that the Defendant's parents and siblings have told him to stop because they don't agree with his posts. Audio Det. Hrg. 01:53:24-02:14:25. The Government proffered that the FBI and Secret Service conducted a post arrest interview and that Mr. Lopez acknowledge he knew the Agents were

2

there because he had posted on X that he was going to kill the president. Audio Det. Hrg. 02:42:18 – 03:14:25. The Government provided context that the Defendant told the Agents it was part of a chat with a "troll" on the internet. Audio Det. Hrg. 03:14:25 – 03:36:10. The Government continued that Mr. Lopez stated he knew he shouldn't engage with people like that but, he (the troll), was saying use this as a life learning experience and Mr. Lopez replied to "the troll" that he didn't give a sh*t and was just going to post what he wanted. Audio Det. Hrg. 03:36:13 - 03:51:29.

The Government continued to describe the interview between law enforcement and Mr. Lopez, advising that in response to questioning he stated, I was just giving up and throwing myself away. And I said, no, I'm not throwing myself away. I haven't lost all hope. I told you; I'm going to kill the president. You know, which I know is immature, and I perform an exaggerated version of myself online, at least on my public accounts. My private accounts are more tame, a lot more tame. Audio Det. Hrg. 04:09:22 - 04:28:03. But yeah, I know that's not the recommended thing to do, but that's what I do. Agent Muster asked, why did you say you're going to kill the president? Why say that? His answer was, I don't like him, I don't know, he's a Nazi. I don't know, I don't think he's I don't know. It's debatable whether Trump's a Nazi. Audio Det. Hrg. 04:28:05 - 04:46:18. Elon Musk is definitely a Nazi. He later, and I added in that conversation that Charlie Kirk is also a Nazi. And then when asked if he had any intention of killing the president, he said, no, I couldn't if I tried. And I know that. And because you guys do a fantastic job, and at least, the government also, proffered that during

the original interview, occurring on October 9th at Illinois State University, the agents have been an Agent Muchler. Aud. Det. Hrg. 04:46:20 - 05:16:22.  Agent Jake Smith said at least twice that, they distinguished for the defendant between the difference between true threats and protected speech, even going so far as to Google it for him on the phone.  Audio Det. Hrg. 05:16:24 - 05:42:01.

Defense counsel called Mr. Lopez's mother to testify as a proposed third party custodian.  She testified that her and her husband – the defendant's father – live in Hayworth.  U.S. Pretrial Officer Almonte interviewed her and discussed the obligations of serving as a third party custodian.  Neither her nor her husband have a criminal record, nor firearms.  Audio Det. Hrg. 07:16:24 – 08:34:17.  Her husband is retired, and she is a nanny Tuesday, Wednesday, and Thursdays.  Id.  Mrs. Lopez further testified that she would notify probation if her son violated any conditions of release.  Aud. Det. Hrg. 09:00:21 – 09:34:22.  She continued that she would accept any restrictions put in place to control or monitor any electronic devices in the residence.  Aud. Det. Hrg. 10:09:21 – 10:46:02.

The Government cross-examined Mrs. Lopez and elicited that she did not like seeing his posts and it was risky.  He would rationalize to her that it was free speech and that Gen X or Gen Z think differently.  Aud. Det. Hrg. 12:00-13:07:25.  The Government inquired whether she was aware that during his employment at ISU he had turned over a table on two occasions.  Mrs. Lopez advised she was and when she spoke with him about it, he said he didn't cause any damage. He didn't realize at the time that he felt justified because the TPUSA

4

was a bad organization. That they're very much against LGBTQ. And they are Nazis and they posed as Christians, but he didn't believe they truly were. Audio Det. Hrg. 13:37:18 – 15:12:19. The Government asked what Mrs. Lopez's reaction to the incident was and she said she was disappointed but also a little shocked, not that he did it, but that it got reported so big. She described what she saw on the recording was tipping over a table and showing the students his phone with the Bible on it saying "well, Jesus did it". Audio Det. Hrg. 15:21 – 15:35:22.

Argument was heard and the Government articulated that Mr. Lopez is vocal about his dislike of people he perceives to be Nazis and Fascists. He holds a belief that Nazis and Fascists should be killed but has no ability or willingness to do so himself. Further, that because the Agents cautioned him on October 9, 2025, to not continue with his posting against the Administration, and he subsequently posted I'm going to kill the President, IDGAF, he is a danger to the community. Finally, the Government argued that his family disapproved of his posts, but he didn't stop. The Government argued that he is a danger to anyone who has a belief contrary to his. Aud. Det. Hrg. 26:35:01 – 26:58:15.

Defense counsel argued that agents interviewed him and heard him say he thought it was protected speech. The chat log wherein he made the statement was followed with a statement acknowledging his lack of ability to actually kill the president. Plus, the agents knew Mr. Lopez had no weapons and absolutely no criminal history prior to this case. Further, Mr. Lopez was working at ISU in the Central District of Illinois and was held accountable for objecting to students

5

who were conducting a public expression of their views with authorization to do so given by the school.

The Court found that Mr. Lopez made an explicit threat to the President of the United States. The Court found that the Pretrial Services Report showed no criminal history, a history of employment, a history of education, and nothing to suggest a violent past. Mr. Lopez has a source of income, and he owns or rents a home. Audio. Det. Hrg. 36:09:22 – 36:34:17. The Court further, indicated a significant history of substance abuse defined as occasional alcohol use, daily cannabis use, and sporadic use of LSD on six occasions since age 23. Audio Det. Hrg. 36:34:26 – 37:13:23. The Court then looked at the chronology of events laid out by the Government and found that on September 15, 2025, a report was received regarding Mr. Lopez's post. On October 9, 2025, he was interviewed by the FBI and October 10, 2025, he posted about that interaction, which the Court found to be mocking the agents. On October 13, 2025, the table incident at ISU occurred and you stated online that you don't want to kill people, but it's your honest opinion that some powerful people should be killed. Saddam Hussein was killed and nobody questioned it. Now, with Nazis and Fascists in the White House, it feels bad to say, I hope those people get killed by someone and when he posts he's not very clear that he doesn't want to kill them himself. Audio Det. Hrg. 37:13:25 – 39:29:18.

The Court continued that the posts are designed to scare people to be less of a Nazi of a Fascist because you said Nazis are people who should be scared to be who they are and your posts are to scare those people. Further, Mr. Lopez

6

hopes his posts make non-Nazis and non-Fascists feel safer. Audio Det. Hrg. 39:03:13 – 40:17:26. The Court found those statements are not free speech and that threatening to take the life of the President or other officials constitutes a crime of violence within section 3156(a)(4)(A), because it has an element to threaten use of physical force against another. This conduct coupled with the physical aggression on October 13th demonstrates the seriousness and potential danger to the community. Audio Det. Hrg. 40:17:28 – 41:28:29. The Court agreed with the Government that there is extremely strong evidence in this case and your mocking FBI Agent Smith. Although the Court found no prior criminal history, Mr. Lopez's behavior shows a non-amenability to supervision that there aren't conditions or a combination of conditions that would ensure this Court that you were going to comply, were this Court to order you be released. The Court found his conduct to be volatile, poor impulse control, the behavior is escalating, and a defiance toward authority that undermines confidence that you will be supervised or willing to comply with any Court imposed conditions. The nature of the danger is not a hypothetical; you advocate for gun violence. No conditions, such as internet restrictions or third party supervision or GPS monitoring, would reasonably assure the safety of the community. The Court also found Mr. Lopez to be a risk of non-appearance due to his defiant behavior. Mr. Lopez is a danger to the community and cannot be trusted to comply with conditions. Audio Det. Hrg. 41:39:01 – 44:33:01.

## II. Argument

The Bail Reform Act "BRA" requires pretrial release more often than not. In upholding the BRA, our Supreme Court has ruled that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). This rule set forth in the BRA favors pretrial release. 18 U.S.C. § 3142. The statute mandates that the district court "shall order" pretrial release, § 3142(b), except in certain narrow circumstances. Even if the Court determines that unsecured bond under § 3142(c) is not sufficient, the Court "shall order" release subject to "the least restrictive further condition[s]" that will "*reasonably assure*" the defendant's appearance in court and the safety of the community. § 3142(c)(1) (emphasis added). Appellate courts, including the Seventh Circuit, agree that the BRA's "default position . . . is that a defendant should be released pending trial[,]" and "[p]retrial detention is still an exceptional step." *See Torres*, 929 F.2d at 292; *United States v. Stone*, 608 F.3d 939, 940 (6th Cir. 2010). *See also United States v. Santos-Flores*, 794 F.3d 1088, 1090 (9th Cir. 2015) ("Only in rare cases should release be denied, and doubts regarding the propriety of release are to be resolved in favor of the defendant."); *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007) ("[T]he law thus generally favors bail release."); and *United States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992) ("There can be no doubt that this Act clearly favors nondetention.").

But, in practice, the default has become pretrial detention. In the Central District of Illinois, 72.6% of federal criminal defendants were detained pending

8

trial in FY2019, among the top ten districts with the highest detention rates nationwide.[1] This district creates unwarranted disparity in pretrial detention rates by far surpassing the majority of districts nationwide in which the BRA acts as it was intended for "only a 'limited group of offenders' who should be detained pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225, at 7 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3189).[2]

The types of offenders in our district are no more dangerous to the public than in other parts of the country and it is time to level the unwarranted disparity with zealous litigation for pretrial release. Part of that disparity is created by an improper weighing of factors compared to conditions of release that can be imposed and an unabated reticence for the status quo that considers *any* risk of danger to warrant detaining a defendant pending trial. Neither the BRA nor binding precedent creates such a formula. Rather, defendants must be released pending trial when a combination of conditions will "*reasonably assure*" a defendant's appearance in court and the safety of the community. § 3142(c)(1) (emphasis added).

In Mr. Lopez's case the burden is on the Government to show by clear and

---

[1] *Judicial Business: Federal Pretrial Services Tables*, Admin. Off. U.S. Courts ("AO Table"), Table H-14A (Sept. 30, 2019), https://www.uscourts.gov/sites/default/files/data_tables/jb_h14a_0930.2019.pdf (excluding immigration cases). In FY 2021, that number was only slightly lower at 69 percent of defendants detained and never released in the Central District of Illinois, excluding immigration cases. AO Table 14-A (Sept. 30, 2021), https://www.uscourts.gov/sites/default/files/data_tables/jb_h14a_0930.2021.pdf.

[2] *See* AO Table H-14A (districts with the lowest detention rates in FY 2019 detained defendants pretrial in approximately 35 to 45 percent of cases).

convincing evidence that there are conditions or a combination of conditions that will reasonably assure the Defendant's appearance and the safety of the community. The Court found the record shows a preponderance that his behavior is a risk of non-appearance and therefore the Government has met its' burden. Audio Det. Hrg. 44:10 – 44:33. The BRA articulates conditions that can be utilized to reasonably assure appearance in court and safety of the public.

The very first condition is "(i) remain in the custody of a designated person, who agrees to assume supervision and to report any violation of a release condition to the court, if the designated person is able to reasonably assure the judicial officer that the person will appear as required and will not pose a danger to the safety of any other person or the community." 18 U.S.C. § 3142(c)(B)(i). The Court made no findings regarding the suitability of the proposed third party custodian in this case.

The importance of granting pretrial release in accordance with the BRA cannot be understated. Federal "pretrial detention is itself associated with increased likelihood of a prison sentence and with increased sentence length," even after controlling for criminal history, offense severity, and socio-economic variables.[3] A study by the Administrative Office of the Courts (AO) found a relationship "between the pretrial detention of low-risk defendants and an increase in their recidivism rates, both during the pretrial phase as well as in the years following case disposition."[4] These stark statistics must also be considered

---

[3] James C. Oleson et al., *The Sentencing Consequences of Federal Pretrial Supervision*, 63 Crime & Delinquency 313, 325 (2014), archived at https://perma.cc/QAW9-PYYV.
[4] Amaryllis Austin, *The Presumption for Detention Statute's Relationship to Release Rates*, 81

10

in light of the fact that 99% of federal defendants are not rearrested for a violent crime while on pretrial release.[5] There are also significant fiscal costs associated with high federal pretrial detention rates. As of 2016, the average pretrial detention period was 255 days (although several districts averaged over 400 days in pretrial detention).[6] Pretrial detention costs an average of $73 per day per detainee, while pretrial supervision costs an average of just $7 per day.[7] In other words, pretrial detention imposes enormous costs on criminal defendants, their loved ones, the community, and the justice system, in a counterproductive attempt to prevent crimes that are extremely unlikely to happen in the first place.

Higher detention rates do not correlate with any increased protection from nonappearance or safety of the community. Research shows that districts with high and low pretrial release rates have nearly identical—and equally miniscule—rates of failure to appear and new crimes.[8] This is why Congress intended pretrial release to be the norm and not the exception.[9] The Court in the Central

---

FED. PROB. 52, 54 (2017) (citing Christopher T. Lowenkamp et al., *Investigating the Impact of Pretrial Detention on Sentencing Outcomes* (The Laura and John Arthur Foundation 2013), https://craftmediabucket.s3.amazonaws.com/uploads/PDFs/LJAF_Report_state-sentencing_FNL.pdf.

[5] Thomas H. Cohen et al., *Revalidating the Federal Pretrial Risk Assessment Instrument: A Research Summary*, 82(2) Fed. Prob. 23, 26 (2018), https://www.uscourts.gov/sites/default/files/82_2_3_0.pdf.
[6] Austin, *supra* note 4, at 53. It is important to note that the bottom of Mr. Sims' applicable guideline estimate is only 10 months (approximately 300 days). Pretrial detention under these circumstances effectively prevents the defendant from making any motion for a variance from the applicable guideline range based upon mitigating factors.
[7] *Id.* Thus, 255 days of pretrial detention would cost taxpayers an average of $18,615 per detainee, while pretrial supervision for the same time would cost an average of $1,785.
[8] Allison Seigler & Erica Zunkel, *Rethinking Federal Bail Advocacy to Change the Culture of Detention* 3-4, The Champion (July 2020), https://www.law.uchicago.edu/node/86291 (citing district data and concluding that in ten districts with the highest and lowest release rates, failures to appear occurred in only .87% and 1.37% of cases respectively, and rearrests occurred in 2.29% and 1.19% of cases respectively.).
[9] Congress drafted the BRA with intent to only detain to detain a "small but identifiable group of particularly dangerous defendants." S. Rep. No. 98-225 at 6, *as reprinted in* 1994

District has inserted that a wife is not an appropriate custodian by definition demonstrates how "in federal courts across the country, the law as it operates in practice has become untethered from the law as written in the statute."[10] Allowing the Court, to expand the BRA in this way will have the result in significant increase in detention and denial of liberty for those awaiting trial without a valid basis under the law.

The evidence presented showed that Mr. Lopez had no record, had employment history, no history of prior violence, had a home, family that was willing to serve as a third party – despite disagreeing with his alleged conduct – sporadic use of LSD on six occasions, and regularly use of marijuana. The Government through its own proffer, showed that Mr. Lopez, when questioned by law enforcement, had no intention of shooting the President, no indication that anyone saw the post since it was immediately removed, and in fact he stated that he wasn't serious to the Troll in their exchange online. The Court did not meaningfully consider the conditions proposed for release or the recommendation of release by Probation with carefully crafted conditions.

WHEREFORE, Mr. Lopez moves this Court to revoke the detention order and release him on bond with conditions to include residing with the third party custodian, monitoring access to the internet and electronic devices, and surrendering his passport during the pendency of this case.

Respectfully submitted,

KURT KNISLEY,

---

U.S.C.C.A.N. at 3188.
[10] *Id.* at 1.

12

Defendant,

THOMAS PATTON,
Federal Public Defender,

By: *s/ Jessica Douglas*
Jessica Douglas
Assistant Federal Public Defender
Federal Public Defender's Office
401 Main Street, Suite 1500
Peoria, Illinois 61602
Telephone: (309) 671-7891
Fax: (309) 671-7898
E-mail: jessica_douglas@fd.org

**CERTIFICATE OF SERVICE**

I hereby certify that on November 7, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the parties of record.

By: *s/ Jessica Douglas*
Jessica Douglas
Assistant Federal Public Defender